IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) Criminal No. 5:25-CR-319 (BKS) |
| | ) |
| v. | ) **Information** |
| | ) |
| **CHO Y. CHANG,** | ) Violation: 18 U.S.C. § 371 [Conspiracy to Commit |
| | ) Bribery and Honest Services Wire Fraud] |
| **Defendant.** | ) |
| | ) 1 Count and Forfeiture Allegation |
| | ) |
| | ) County of Offense:  Oneida |

**THE UNITED STATES CHARGES**:

**Overview and General Allegations**

At times material to this information:

    1.    The defendant, **CHO Y. CHANG ("CHANG")**, was a Senior Computer Scientist and Section Head of the U.S. Naval Research Laboratory's ("NRL") Integrated Communication Technology Section until on or about October 31, 2024.  NRL, which was headquartered in Washington, D.C., served as the primary scientific and engineering research and development center for the U.S. Navy and the U.S. Marine Corps.  **CHANG's** official duties included serving as the Technical Point of Contact ("TPOC") on NRL research projects focusing on Naval telecommunications systems, conducting research, and overseeing contract awards and authorizing contract payments regarding his research projects.

    2.    CO-CONSPIRATOR A was a Senior Computer Scientist with the U.S. Air Force Research Laboratory ("AFRL") from at least in or about November 23, 2019, to the present.  AFRL, which was headquartered in Rome, New York, in the Northern District of New York, served as the primary scientific research and development center for the U.S. Air Force.  CO-

CONSPIRATOR A's duties included serving as the Agreement Officer's Technical Representative ("AOTR") for an AFRL program called Open Technology & Agility For Innovation ("OTAFI"). CO-CONSPIRATOR A and **CHANG** used OTAFI as a contracting vehicle for NRL projects starting in or about early 2022.

3. COMPANY A was a technology firm operated by one of CO-CONSPIRATOR A's family members in the Northern District of New York. COMPANY A was formed in Delaware on or about September 7, 2023. CO-CONSPIRATOR A assisted in creating and developing business for COMPANY A.

4. COMPANY B was a technology firm in Utah. COMPANY B received government contracts awarded through OTAFI relating to NRL projects. With **CHANG** and CO-CONSPIRATOR A's knowledge and involvement, COMPANY B took the following actions: (a) retained COMPANY A as a subcontractor (operated by CO-CONSPIRATOR A's family member); (b) retained CO-CONSPIRATOR A's spouse as a consultant; and (c) used NRL funds awarded by OTAFI to pay COMPANY A and CO-CONSPIRATOR A's spouse in the Northern District of New York. **CHANG** authorized these payments.

5. CO-CONSPIRATOR B was an employee of COMPANY B. Among other things, CO-CONSPIRATOR B oversaw COMPANY B's business development and managed the contracts awarded by OTAFI to COMPANY B relating to NRL's projects. **CHANG** and CO-CONSPIRATOR B were friends and former co-workers.

6. OTAFI used a special contract vehicle called "Other Transaction Agreements" or "OTAs." OTAs were used for advancing research and development projects or obtaining prototypes from commercial sources, including nontraditional defense contractors, outside normal

2

federal acquisition regulations and often on an accelerated, as-needed basis. NRL funded some of AFRL's OTAs. AFRL in turn received a portion of NRL's funding as a fee for administering and overseeing the OTAs. **CHANG**, on behalf of NRL, served as the TPOC for the OTAs managed by AFRL. CO-CONSPIRATOR A served as the Contracting Officer Representative ("COR") and AOTR for AFRL's OTAs.

7.  Since in or about early 2022, **CHANG** and CO-CONSPIRATOR A steered and awarded two OTAs to COMPANY B for NRL projects. Specifically, in or about August 2022, COMPANY B received an OTA award of approximately $8.4 million, after **CHANG**, with CO-CONSPIRATOR A's assistance, selected COMPANY B over 11 other companies that had each submitted a bid for the OTA award. In or about September 2023, COMPANY B received another OTA award of approximately $39.5 million, after **CHANG**, with CO-CONSPIRATOR A's assistance, selected COMPANY B over 12 other companies that had each submitted a bid for the OTA award. In or about March 2024, OTAFI issued an OTA solicitation for an NRL project valued at approximately $98 million. **CHANG** selected COMPANY A and COMPANY B to advance in the selection process over 11 other companies that had each submitted proposals for the OTA solicitation. AFRL suspended this OTA before it was awarded, however.

## COUNT 1

### [Conspiracy to Commit Bribery and Honest Services Wire Fraud]

8.  The allegations set forth in paragraphs 1-7 are realleged and incorporated by reference as though fully set forth herein.

9.  Beginning in or about January 2022, and continuing until in or about June 2024, in the Northern District of New York and elsewhere, the defendant, **CHO Y. CHANG**, and CO-

CONSPIRATOR A, both public officials as defined in 18 U.S.C. § 201(a); CO-CONSPIRATOR B; and others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree together and with each other:

    a.    To engage in bribery, that is, to directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity in return for: (1) being influenced in the performance of any official act; and (2) being influenced to commit and aid in committing, and collude in, and allow, any fraud, and make opportunity for the commission of any fraud, on the United States, in violation of 18 U.S.C. § 201(b)(2)(A)-(B).

    b.    To engage in bribery, that is, to directly and indirectly, corruptly give, offer, and promise anything of value to any public official, and offer and promise any public official to give anything of value to any other person and entity, with intent (1) to influence any official act; and (2) to influence such public official to commit and aid in committing, and collude in, and allow, any fraud, and make opportunity for the commission of any fraud, on the United States, in violation of 18 U.S.C. § 201(b)(1)(A)-(B).

    c.    To devise and intend to devise a scheme and artifice to defraud and deprive the NRL, AFRL, and the citizens of the United States of their intangible right to the honest services of **CHANG**, a senior NRL official, and CO-CONSPIRATOR A, a senior AFRL official, through bribes and kickbacks and the concealment and misrepresentation of material information, and to cause wire communications to be transmitted in interstate commerce for the purpose of executing such scheme, in violation of 18 U.S.C. §§ 1343 and 1346.

**Manner and Means of the Conspiracy**

The conspiracy was carried out through the following manner and means, among others:

10. **CHANG**, CO-CONSPIRATOR A, and CO-CONSPIRATOR B agreed to engage in a corrupt and fraudulent scheme in which CO-CONSPIRATOR B, through COMPANY B, paid bribes and kickbacks to **CHANG** and CO-CONSPIRATOR A. In exchange, **CHANG** and CO-CONSPIRATOR A agreed to perform, and did perform, official acts—and advised other officials, knowing and intending such advice to form the basis for official acts—benefitting CO-CONSPIRATOR B and COMPANY B regarding the awarding, modifying, administering, and supervising of the OTAs awarded for the NRL projects. Among other things, **CHANG** and CO-CONSPIRATOR A, using a sham process, steered the solicitation and review processes for the OTAs to ensure that COMPANY B and CO-CONSPIRATOR B would (a) receive the OTA awards over other companies; and (b) thereafter receive payments for meeting contract milestones that in some instances had nothing to do with the OTAs' stated purpose (such as building prototypes).

11. In exchange for **CHANG** and CO-CONSPIRATOR A's official assistance, COMPANY B and CO-CONSPIRATOR B used NRL funds awarded through OTAFI and AFRL to provide a stream of payments and other things of value to **CHANG**, CO-CONSPIRATOR A, and their respective family members during a period when COMPANY B was seeking OTAs through OTAFI. With CO-CONSPIRATOR A's knowledge and involvement, **CHANG** approved the payments and other things of value for **CHANG**, CO-CONSPIRATOR A, and their respective family members.

12. The benefits for **CHANG** included travel reimbursement for himself and family members totaling at least approximately $225,000 to at least approximately $283,760.40. The travel reimbursement benefits include the following:

   a. **CHANG** and, at times, his family members took approximately 43 trips that involved personal travel or a combination of personal travel and official travel. **CHANG** authorized COMPANY B to use OTA funds to reimburse these trips. Instead of using his government travel system for authorization and vouchers, as he was required to do for official travel, **CHANG**, in many instances, booked and paid for most of the trips using his personal email account and credit cards and then sought reimbursement directly from COMPANY B. Several of these trips involved travel upgrades, such as first-class airline tickets, for both **CHANG** and his family members. **CHANG** also sought and received reimbursement for travel and other expenses incurred by family members for trips that **CHANG**'s family members took without him.

   b. To conceal from the government and others the fact that his travel expenses included family members, **CHANG** submitted fake airline and hotel receipts to COMPANY B, falsely claiming that other NRL employees were traveling with him or by themselves.

   c. **CHANG**'s reimbursement requests included several trips to New York City to see a family member, several trips to San Francisco to see another family member, and several trips to various locations accompanied by his spouse. On approximately 21 trips, **CHANG** "double-dipped" by also submitting a voucher with his government travel system, thereby seeking reimbursement for the same trips paid by COMPANY B. **CHANG** often "double-dipped" to cover the cost of having a family member travel with him. These travel practices also increased **CHANG**'s point totals in hotel and airline loyalty programs.

13. The benefits obtained by **CHANG** also included approximately $50,000 to $100,000 in personal items that **CHANG** submitted to COMPANY B for purchase using NRL funds awarded through the OTAs. **CHANG** frequently had these goods shipped to his residence or the residences of his family members. The personal items included, among other things, Apple iPhones; computer monitor(s); cellular telephone activation fees; monogrammed luggage; wireless routers, networks and related technology; household products; passport photos; and airlines club membership dues.

14. The benefits for CO-CONSPIRATOR A included approximately $60,400 in consulting fees for CO-CONSPIRATOR A's spouse (purportedly to perform a portion of CO-CONSPIRATOR A's official work at AFRL); a gross amount of approximately $190,000 to COMPANY A (and a net amount of approximately $12,141.26) to assist COMPANY B and CO-CONSPIRATOR B with the acquisition of materials and supplies; approximately $1,500 for another family member in exchange for a business service performed in the Northern District of New York; and approximately $150,000 to $170,406.48 in other things of value shipped to CO-CONSPIRATOR A's residence (or the residences of family members) in the Northern District of New York, most of which were meant for personal use. The personal items included, among other things, home renovation tools, tool bags, and Apple products (*e.g.*, iPhones and accessories, watches, AirPods, and laptops). CO-CONSPIRATOR A also submitted requests to ship items (including a drone for approximately $48,433.30 and three MacBooks and software licenses totaling approximately $15,819.67) to the personal residences of AFRL colleagues. After CO-CONSPIRATOR A submitted these various requests for materials, **CHANG** authorized COMPANY B to use AFRL administrative fees awarded through the OTAs to pay for them.

**Object of the Conspiracy**

15.     The purpose of the conspiracy was:  (a) to use **CHANG** and CO-CONSPIRATOR A's positions as senior officials with NRL and AFRL, respectively, to benefit and enrich CO-CONSPIRATOR B, COMPANY B (and its owners), CO-CONSPIRATOR A (and family members), and **CHANG** (and family members) through bribes and kickbacks; (b) to defraud the NRL and AFRL and citizens of the United States and deprive them of their intangible right to the honest services of **CHANG**, a senior official with NRL, and CO-CONSPIRATOR A, a senior official with AFRL, through bribery and kickbacks; and (c) to conceal the nature and purpose of the scheme.

**Overt Acts**

In furtherance of the conspiracy and to effect its objects, **CHANG**, CO-CONSPIRATOR A, CO-CONSPIRATOR B, and others committed the following overt acts, among others, in the Northern District of New York and elsewhere:

16.     On or about May 2, 2022, **CHANG** and CO-CONSPIRATOR A completed a technical / cost evaluation for COMPANY B and recommended the selection of COMPANY B's proposal for an OTA awarded in or about August 2022.

17.     On or about September 6, 2022, CO-CONSPIRATOR A, using a government email account, sent an email to **CHANG**'s government email account, attaching an invoice relating to COMPANY B totaling approximately $363,809.  The email stated, "Cho, Please note that you will receive each invoice for you [sic] review and digital signature before the contractor receives payment.  Please review the milestone deliverable for the attached invoices.  If the deliverables are technically acceptable sign and return the invoice, otherwise respond rejecting the invoice and provide your reasons. . . ."

18. On or about February 13, 2023, **CHANG**, using his personal email account, submitted a reimbursement request to COMPANY B for travel expenses purportedly incurred by **CHANG** and another NRL employee, for a one-week, first-class trip from Washington, D.C. to San Francisco, California and Honolulu, Hawaii, totaling approximately $21,060.32. Instead, this trip was taken by **CHANG** and his spouse.

19. On or about January 17, 2023, CO-CONSPIRATOR A, using his government email account, sent an email to **CHANG**'s government account, attaching invoices relating to COMPANY B totaling approximately $57,537 and $269,580. The email stated, "Cho, Please sign the following invoices if you approve."

20. On or about March 13, 2023, **CHANG**, using his personal e-mail account, submitted a travel reimbursement request to COMPANY B seeking payment for "Judy Evans" for an airline flight on March 9, 2023, from Paris, France to New York City, totaling approximately $5,993.35. **CHANG**'s family member—and not "Judy Evans"—was the actual passenger.

21. On or about May 4, 2023, **CHANG**, using his personal email account, submitted a reimbursement request to COMPANY B for a first-class trip to Honolulu, Hawaii, totaling approximately $8,782.49, that was purportedly taken by **CHANG** and another NRL employee. Instead, the trip was taken by **CHANG** and his spouse.

22. On or about May 4, 2023, **CHANG**, using his personal e-mail account, submitted a material reimbursement request to COMPANY B that included a receipt for a purchase he made from Amazon utilizing a personal credit card on or about April 25, 2023. The receipt indicated the purchase totaled approximately $1,448.70 for a computer monitor. **CHANG** included a family member's residence near San Francisco, California as the shipment destination.

23. On or about July 5, 2023, **CHANG**, using his personal email account, submitted a reimbursement request to COMPANY B for a first-class trip to San Francisco, California, totaling approximately $9,311.38, that was purportedly taken by **CHANG** and another NRL employee. Instead, the trip was taken by **CHANG** and his spouse.

24. On or about July 5, 2023, **CHANG**, using his personal email account, submitted a material reimbursement request to COMPANY B that included a receipt for $550.00 for his personal airlines club membership with a major airline.

25. On or about July 7, 2023, CO-CONSPIRATOR A digitally signed a technical / cost evaluation of COMPANY B's proposal for the OTA awarded in 2023. CO-CONSPIRATOR A, using a government email account, then sent the signed proposal evaluation to **CHANG**'s government email account, stating: "Cho, Please see for your signature. Word attached also for reference." **CHANG** countersigned on or about July 7, 2023. **CHANG** and CO-CONSPIRATOR A recommended the selection of COMPANY B's proposal.

26. On or about September 19, 2023, **CHANG**, using his government email account, sent an email to one of COMPANY B's owners after receiving a COMPANY B payment request of approximately $864,265. **CHANG** replied in part, "I approved the submission. Thanks, Cho[.]"

27. On or about September 21, 2023, CO-CONSPIRATOR B sent an email to **CHANG** regarding the OTAs awarded to COMPANY B. The email states in part:

> 1. Next contract
>
> Spoke with [CO-CONSPIRATOR A] to review contract steps and came to the conclusion a $200M split evenly between two awards would be the best approach.
>
> [CO-CONSPIRATOR A] can explain why.

2. Current [COMPANY B] contract

- when money is received I would like W2 pay done including the additional SSN / Medicare tax which can be borrowed from the overall funds (max for 1 year is less than $17K)
I would then repay the $17K at the end of the year out of the remaining payment due to me…it may not even
reach $17K and also doing a single payment is easier than multiple
If this is agreeable then explain to [COMPANY B owner] that this is acceptable

(You figured if someone helps bring in a $40M contract and does the bulk of the work taking a lower fee that they would have to courtesy to pickup this small amount…this will all be changed with the next larger contract)

COMPANY B actions
- must be responsive
- must follow up on orders COMPANY B does
- end of Friday each week a total remaining funds is [sic] given

(I plan to email receipts in each Monday morning if they are over $5K so they can add that to the new weekly total)
I always send company, reference and cost but plan to add date ordered.

3. Future contracts.

We've discussed things and would review once closer to the award.

4. Old contract $8M

I did 95% of the work and was fortunate enough that you paid me monthly as it kept me from just dropping it.

FYI - I will be putting in for $5K for Sept since no money from the new contract has been received…let me know if this is acceptable.

28. On or about October 2, 2023, CO-CONSPIRATOR A, using a government email account, sent an email to **CHANG**'s government email account, attaching a COMPANY B invoice totaling approximately $1,997,743. The email stated, "Cho, Please see for your approval."

11

29.    On or about October 3, 2023, **CHANG**, using his government email account, sent an email to one of COMPANY B's owners, copying CO-CONSPIRATOR B.  The email included contact information for COMPANY A and stated in part:  "Could you please add the following vendor to the [COMPANY B] payment list[.]  I will have you make payment to them after I approve their invoices.  Please contact [CO-CONSPIRATOR A's relative] for the payment mechanism."

30.    On or about October 5, 2023, **CHANG**, using his personal email account, sent an email to CO-CONSPIRATOR B, forwarding a chain email that **CHANG** sent on the same day to one of COMPANY B's owners.  **CHANG**'s email to COMPANY B stated:

> just want to re-cap (summarize) what we had discussed yesterday on the phone. Please let me know if you disagree or have any issues.
> For the new OTA:
> 1) When you receive fund from [OTA consortium], here is the fee breakdown:
>    a -3% of the amount will be set aside for AFRL, that is their fees
>    b -5% [COMPANY B] fees will be levied on the balance of the fund after the AFRL fees.
>       Of the 5%, 1.75% of that goes directly to [CO-CONSPIRATOR B]. You will work out with [CO-CONSPIRATOR B] on how [CO-CONSPIRATOR B] would like to receive [CO-CONSPIRATOR B's] share.
>
> 2) [COMPANY B] will be responsive in wiring funds, purchasing items (must follow-up on all purchases until it is delivered to the end customer).
>
> 3) Weekly financial status report. At the end of each Friday, I want to see a summary of all incoming funds and all outgoing payment/charges and the current balance.
> For example, date you received funds, date you make payment to [CO-CONSPIRATOR B], me, and other vendors and the amount.
> For each purchase [CO-CONSPIRATOR B] made, please indicate

>   whether it is full payment or partial and the current status of the orders.
>
>   4) If you will be out of pocket, please let us know ahead of time so we can plan better to avoid any crisis in your absence. If you will be reachable during your absence, please let us know and what time period of the day. Or if there is someone that can act as your backup.

31. On or about October 20, 2023, **CHANG**, using a personal email account, sent an email to one of COMPANY B's owners, stating: "I approve this invoice for $50K to [COMPANY A]. Thanks, Cho."

32. On or about October 19, 2023, **CHANG**, using his personal email account, sent an email to COMPANY A, stating: "Please purchase the followings for [CO-CONSPIRATOR A]." The list included an iPhone and a digital thermal imaging camera, totaling approximately $13,187.58

33. On or about December 5, 2023, **CHANG**, using his personal email account, sent an email to COMPANY A approving an invoice submitted by CO-CONSPIRATOR A's spouse for consulting services.

34. On or about December 29, 2023, CO-CONSPIRATOR A, using a government email account, sent an email to **CHANG**'s government email account, attaching two invoices from COMPANY B, in the amounts of $1,460,033 and $2,029,048. The email stated, "Cho, Please see for approval." **CHANG**, after digitally signing the invoices, sent a reply email to CO-CONSPIRATOR A, stating, "[CO-CONSPIRATOR A], Here are the signed copies."

35. On or about March 7, 2024, **CHANG**, using his government email account, sent an email to one of COMPANY B's owners in connection with a request to pay a COMPANY B invoice totaling $3,969,653. **CHANG** responded, "I approved the submission."

36. On or about April 23, 2024, **CHANG**, using his government email account, sent an email to CO-CONSPIRATOR A's government email account, stating: "[CO-CONSPIRATOR A], From the white papers, I selected [COMPANY B] and [COMPANY A]. Please move forward with them." CO-CONSPIRATOR A then forwarded the information to AFRL's procurement officials.

37. On or about May 14, 2024, **CHANG**, using his government email account, sent an email to COMPANY B, seeking reimbursement for a train trip purportedly taken by **CHANG** from Baltimore-Washington International Airport to New York City, totaling approximately $1,417.36. The trip was taken by **CHANG**'s family member, and **CHANG** altered the receipts to change the dates and passenger.

In violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

The allegations contained in Count 1 of this Information are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 981(a)(1)(C), as incorporated by 28 U.S.C. § 2461(c).

Upon conviction of an offense in violation of 18 U.S.C. § 371, as set forth in Count 1, the defendant, **CHO Y. CHANG**, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), as incorporated by 28 U.S.C. § 2461(c), any property, real and personal, constituting and derived from proceeds traceable to the offense, including, but not limited to:

(1) A money judgment in the amount of at least $275,000 and no more than $383,760.40.

**Substitute Assets**

If any of the property described in the Forfeiture Allegation above, as a result of any act or omission of the defendant, either: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p) and Federal Rule of Criminal Procedure 32.2(e).

(In accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

Respectfully submitted,

JOHN A. SARCONE III
Acting United States Attorney

By: _____
Stephen C. Green
Assistant United States Attorney
Bar Roll No. 507767

EDWARD P. SULLIVAN
Acting Chief, Public Integrity Section
U.S. Department of Justice

By: _____  by SCG
Edward P. Sullivan
Acting Chief, Public Integrity Section